# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CHARLENE FEASTER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 805 |
| v. | ) | |
| | ) | |
| GREYHOUND LINES, INC., | ) | Judge Joan B. Gottschall |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charlene Feaster filed this lawsuit against her former employer, Greyhound Lines, Inc. ("Greyhound"), alleging that her employment was terminated because of her gender, and that she was retaliated against for complaining of gender discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* She also claims that she was denied equal pay as guaranteed by the Equal Pay Act ("EPA"), 29 U.S.C.A. § 206(d)(1). For the reasons that follow, Greyhound's motion for summary judgment is granted.

## BACKGROUND

Feaster began working for Greyhound in 1992 as a part-time bus operator in Chicago. After becoming a full-time bus operator, Feaster was promoted to the position of Driver Supervisor in February 1997. Until June 2000, Dennis Marshall held the position of Driver Manager and supervised Feaster, as well as two other Driver Supervisors, Vernon Robinson and Larry Russell. In July 2000, Marshall was demoted to Driver Supervisor and John King was brought in from Greyhound's Boston office to take over the role of Driver Manager. Ultimately, Marshall was terminated as a Driver Supervisor in November 2000. Thus, after Marshall's termination, King

supervised Feaster, Robinson and Russell.[1] Feaster's responsibilities included light-duty payroll, "route break in", the Zap and Go Safe Program, workmen's compensation, driver hiring, management duties, and, beginning in December 2000, writing out "hold-downs." For some of these responsibilities, including the Zap and Go Safe Program and driver hiring, Feaster had the assistance of King and others. Writing out hold-downs consists of reviewing each driver's request for vacation/sick leave and determining which shifts need to be filled. Marshall was responsible for the hold-downs until he was terminated in November 2000. While Feaster was responsible (beginning some time in December 2000) for writing out the hold-downs, Russell and Robinson were responsible for reviewing her work, posting the openings and awarding the bids according to driver seniority.

On January 8, 2001, King had a meeting with Feaster in which he discussed some performance issues with her. Specifically, he discussed errors she made while writing up hold-downs, as well as her poor attitude. After the meeting with King, Feaster went to the District Manager, Brian Balogh, to complain that King was harassing her by writing her up regarding errors she made writing up hold-downs and giving her a heavier workload than the other Driver Supervisors. Specifically, Feaster complained that her workload was heavier than her colleagues' because she was responsible for writing out the hold-downs, while Russell and Robinson only had to post them and award the bids. On January 9, 2001, Feaster sent an email titled "Formal Complaint of Harassment!" to Sheila Talley of the Human Resources Department. In that email, Feaster complains of unequal work distribution, but never mentions discrimination based on her gender. On

---

[1] A fourth Driver Supervisor was transferred to the Chicago office on January 24, 2001 but Feaster makes no mention of him in her allegations.

2

January 10, 2001, Balogh met with King and Feaster and summarized areas of concern in a memorandum to them. The memorandum listed the following concerns: "Workload distribution"; "John taking criticism personally"; "Scheduling"; "The other [Driver Supervisors]"; "Charlene's attitude"; "Teamwork"; and "Communication." After meeting with Feaster and King, Balogh concluded that King would determine how to handle the matter. King evaluated Feaster's workload and determined that it was not heavier than the other Driver Supervisors'.

On January 27, 2001, King met with Feaster to discuss specific work issues, including those outlined by Balogh in his January 10, 2001 memorandum as well as those contained in a separate memorandum prepared by King. In his memo, King set out the duties and responsibilities assigned to Feaster, and detailed problems with Feaster's attitude and communication skills. On February 23, 2001, King met with Feaster for her 2000 annual performance review. While rating her a 3.1375 out of 5.0, King provided detailed comments regarding areas of concern, including Feaster's taking on more work than she can handle, missing deadlines, making errors, failing to communicate with the team and her manager, failing to acknowledge mistakes, and not being a team player. As a result of her review score of 3.1375, Feaster received a merit rate increase of 3.0 percent. Russell, who received a performance evaluation of 3.1, received a rate increase of 3.0 percent. Robinson, who received a performance evaluation of 3.6, received a rate increase of 4.1 percent.

On May 1, 2001, King again met with Feaster to discuss her inadequate performance and subsequently issued her a written warning for a series of problems from January to April 2001, including violating work policies, failing to complete assignments on time, making multiple errors posting hold-downs, and arriving late to work without notifying King. On May 8 and May 10, 2001, King sent emails to Balogh indicating that he continued to have performance problems with Feaster

3

and that he wished to terminate her employment for poor job performance. After King and Balogh discussed Feaster's termination, Feaster was terminated on May 14, 2001 for inadequate job performance. King hired Jerrette Dixon, a woman, to replace Feaster on June 15, 2001. Also, after giving Russell a written warning on May 29, 2001, King terminated Russell's employment in June 2001 for poor job performance.

## ANALYSIS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Gender Discrimination Under Title VII**

Under Title VII, a plaintiff may prove her employment discrimination case either by direct or indirect evidence. Direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus," *Venturelli v. ARC Community Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003), and is "rarely found." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Despite her assertion otherwise, Feaster does not offer any direct evidence. Feaster asserts that Greyhound's Director of Human Resources, Sheila Talley, told Feaster in a

telephone conversation that "Sometimes we as women in the workforce have to do more than our male counterparts . . . [I]n my department I get paid the same amount of money as men and I have to do more work." As a preliminary matter, this comment is not a "smoking gun remark[]" indicating that Greyhound reprimanded and fired Feaster because of her gender. *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (noting that direct evidence of discrimination takes the form of "I fired you because of your age or disability"). In addition, Feaster fails to put forward any evidence that Talley, who worked in Greyhound's Dallas office, had any role whatsoever in the actions taken by King and Balogh. Comments by someone who was not the decision-maker and had no role in the adverse employment action cannot constitute direct evidence of discrimination. *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 n.4 (7th Cir. 1998).

When a plaintiff lacks direct evidence, she may utilize the burden-shifting method of proof established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* framework requires the plaintiff to establish a *prima facie* case of discrimination by demonstrating that she: (1) belongs to a protected class, (2) performed her job to her employer's legitimate expectations, (3) suffered an adverse employment action despite performing satisfactorily, and (4) received less favorable treatment than similarly-situated employees outside the protected class. *Hildebrandt v. Ill. Dep't of Nat'l Res.*, 347 F.3d 1014, 1030 (7th Cir. 2003). If the plaintiff succeeds, the burden shifts to the defendant to provide legitimate, non-discriminatory reasons for its conduct; and if the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's reasons were pretextual. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004).

Feaster argues that she was "given a much heavier workload [than her male counterparts],

unfairly written up, wrongfully reviewed, received a substantially smaller raise based on that review and eventually terminated" because she is a woman. The heavier workload allegation fails the adverse action requirement of *McDonnell Douglas* because Feaster fails to put forward sufficient evidence that she was actually given a heavier workload than the male Driver Supervisors. Even assuming the description she gave of her responsibilities was sufficient, the court cannot make any comparison to Russell and Robinson. Feaster simply asserts, without providing supporting evidence, that her workload was heavier than Russell and Robinson's. In order to consider the heavier workload an adverse action, the court would need proof that Feaster actually received more work assignments (or more burdensome work assignments) than her colleagues.

Where dispositive, the court can proceed directly to a discussion of pretext and does so here for the remaining actions about which Feaster complains. To demonstrate pretext, Feaster must provide sufficient evidence that Greyhound was "motivated by a discriminatory reason" or that Greyhound's proffered explanation "is unworthy of credence." *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003). The pretext analysis centers on whether or not Greyhound "honestly believe[d] in the reasons it offer[ed]," not whether its decisions were correct or desirable. *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir. 2001).

Feaster first argues that she received written reprimands for errors she made in writing up hold-downs while Russell and Robinson made errors and did not receive any reprimands. Greyhound argues that Feaster received write-ups for mistakes that she, in fact, made (and does not dispute that she made). As for Russell and Robinson, Greyhound argues that Feaster has failed to put forward evidence, other than her own assertion, that they made errors and were not reprimanded. The court agrees. Feaster failed to provide evidence that Russell and Robinson made errors similar

6

to those made by Feaster. In her affidavit, Feaster asserts that she discovered errors made by Russell and Robinson and that she reported these errors to King. As an initial matter, the court may consider only admissible evidence at the summary judgment stage. Feaster's assertion that Robinson and Russell told her they were never written-up for errors is hearsay and cannot be considered as evidence of that fact. Without deposition testimony or an affidavit from Russell and Robinson, or even copies of their employee files, the court has no basis for concluding that Russell and Robinson were never reprimanded for errors made while writing up hold-downs. Feaster has failed to put forward any evidence that would lead this court to conclude that Greyhound's proffered reason for the write-ups – that Feaster actually committed errors in writing out hold-downs – was a lie, and that the reprimands were in fact motivated by her gender.

Feaster complains that her February 2001 review, the raise she received as a result of the review, and her termination were all motivated by her gender. According to Greyhound (and not disputed by Feaster), King was a much more demanding supervisor than his predecessor and Feaster failed to meet his higher standards. Greyhound argues that the comments in Feaster's review, and the raise she received as a result of it, accurately and fairly represented King's assessment of her performance problems, her inability to be a team player and her poor attitude. With respect to the termination, Greyhound argues that Feaster, despite given many opportunities, failed to make the changes necessary to meet King's high standards.

In an attempt to show that Greyhound's proffered reasons for her review, low raise and termination were a pretext for gender discrimination, Feaster makes only one argument: that the timing between her complaint of gender discrimination in December 2000 and her review in February 2001, low raise in March 2001 and termination in May 2001 is evidence of pretext. Feaster

conflates the "temporal proximity" argument in a retaliation claim (discussed below) with her pretext analysis, as evidenced by the fact that she discusses *Lang v. Illinois Department of Children and Family Services*, 361 F.3d 416 (7th Cir. 2004), a retaliation case, in her section on pretext. Here, in her disparate treatment claim, the question is whether or not Greyhound's explanation for its actions is merely a cover-up for its true motivation of gender discrimination. Without other evidence, timing does not show that King's true motive for giving her a negative review (and thus a smaller raise) and ultimately firing her was based on gender. "[T]iming alone does not create a genuine issue as to pretext if the plaintiff is unable to prove, through other circumstantial evidence, that [she] was terminated for a reason other than that proffered by the employer." *Pugh v. City of Attica*, 259 F.3d 619, 629 (7th Cir. 2001). The court cannot ignore the fact that within a year of arriving at the Chicago office, King fired three Driver Supervisors – two male and one female. Rather than show that King fired her because of her gender, the facts indicate that King was a demanding boss, of both the women and the men who worked for him. It is also noteworthy that King hired a woman to replace Feaster. In this case, Feaster has failed to put forward any evidence that would suggest that Greyhound's motive for her poor review, her low raise and her termination was based on her gender. For this reason, Greyhound's motion on Feaster's gender discrimination claim is granted.

**Retaliation Under Title VII**

With respect to her retaliation claim, Feaster relies solely on the direct method of proof. To avoid summary judgment on this claim, Feaster must show that she engaged in statutorily protected activity, that Greyhound subjected her to an adverse employment action, and that the two events had a causal connection. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). "Mere temporal proximity between the [protected activity] and the action alleged to have

8

been taken in retaliation for that [protected activity] will rarely be sufficient in and of itself to create a triable issue." *Id.* at 644.

As an initial matter, there is a dispute as to when/whether Feaster informed someone at Greyhound of her belief that King was discriminating against her because of her gender. Greyhound takes the position that Feaster never told anyone at Greyhound that she was being discriminated against because of her gender. In her response to Greyhound's motion, Feaster asserts in an affidavit that she informed King in December 2000 that he was giving her more work than the other two Driver Supervisors because she was a woman. King denies that Feaster ever told him this. While it is true that Feaster never mentioned this fact in her deposition, she was never directly asked to state the first time (or all the times) she reported gender discrimination. Her deposition centered on her complaints in January 2001, and Feaster was never asked about events in December 2000. Taking the facts in the light most favorable to Feaster, the court accepts Feaster's assertion that she first complained of gender discrimination to King in December 2000.

Feaster argues that close proximity in time shows the causal connection between the complaint in December 2000 and her reprimands, poor review and ultimate termination in 2001. Feaster relies solely on *Lang v. Illinois Department of Children and Family Services*, 361 F.3d 416 (7th Cir. 2004) to support the notion that her timing argument is enough to survive summary judgment. In *Lang*, an African-American employee of the Illinois Department of Children and Family Services ("DCFS") lodged a union grievance alleging that DCFS discriminated against black employees by issuing cell phones to white employees only. *Id.* at 417. After making this complaint, Lang, who had never before received any negative reviews, immediately began receiving poor reviews and reprimands for mistakes he did not actually make and for absences he either did not

9

actually take or which were excused. *Id.* After filing a complaint with the EEOC, Lang was targeted even more aggressively by his supervisor, who started criticizing nearly every aspect of Lang's work.[2] *Id.* at 418. Lang also alleged that his supervisor set him up to fail by failing to answer her telephone when he tried to call her and explain his need to take off a week to care for a sick relative. Lang was ultimately terminated for accumulating unauthorized absences.

While acknowledging the limits *Stone* placed on timing in the retaliation context, the Seventh Circuit in *Lang* allowed Lang to survive summary judgment, holding that temporal proximity "may permit a plaintiff to survive summary judgment provided there is also other evidence that supports the inference of a causal link." *Id.* at 419 (relying on a pre-*Stone* case). While the district court relied on the fact that Lang's performance write-ups had already started before the filing of the EEOC charge, the Seventh Circuit determined that the focus should be on the earlier filing of the union grievance (which was based on the racially disparate issuance of cell phones). When viewed in this light, especially in light of the fact that many of the alleged attendance violations were later shown to be baseless and the supervisor's requirements were unrealistic, the court found Lang had presented sufficient "other evidence" that, in conjunction with suspicious timing, provided enough evidence of a causal connection to withstand summary judgment.

Here, the court is not persuaded that Feaster's timing argument carries the day. *Lang* is a unique post-*Stone* case because the Seventh Circuit concluded that Lang presented sufficient "other evidence" – evidence besides suspicious timing – to conclude that a causal connection had been

---

[2] Specifically, the supervisor: (1) made him provide her with daily, detailed itineraries; (2) demanded that he call her every two hours; (3) made him document all activities; (4) began reviewing Lang on a daily basis; and (5) sent Lang over 30 memoranda and emails over a two-month period criticizing his attendance, the timeliness of his work, his use of time, and the quality of his work product.

established. In *Lang*, the court was not faced with the typical case (addressed by *Stone*) where, as here, an employee simply makes a discrimination complaint and alleges that adverse actions follow. Rather, in *Lang*, there was a pattern of retaliation going back to Lang's filing of a union grievance based on disparate issuance of cell phones which was suspicious in its intensity and aggression, particularly in view of the fact that Lang had never before his complaint received any negative reviews. Lang was written up for errors he did not commit and his supervisor gave him tasks that no one could complete and then reprimanded him for it.

Here, besides her timing argument, Feaster provides the court with no other reason to find a causal connection between her complaint and the reprimands, poor review, low raise and termination. Feaster makes much of the fact that she had never received a negative review until the one she received from King in February 2001. However, the supervisor writing Feaster's reviews prior to King's arrival was demoted to Driver Supervisor and soon terminated from all employment at Greyhound. King then enters the scene, and, by all accounts, held his workers to very high standards. This is evidenced by the fact that of five Driver Supervisors, three (two men and Feaster) were all terminated for poor job performance within a year of his arrival. For this reason, the fact that Feaster never before received a poor review does not weigh heavily in the court's consideration. In the end, Feaster fails to provide "other evidence" to bolster her argument that temporal proximity provides the causal connection required by *Stone*. For this reason, Feaster's retaliation claim fails.

**Equal Pay Act Claim**

"The Equal Pay Act, an amendment to the Fair Labor Standards Act, forbids paying workers of one sex less than workers of the opposite sex for equal work that requires equal skill, effort, and responsibility, unless the pay differential is justified by factors other than sex, such as seniority,

merit, experience, or education." *Howard v. Lear Corp. EEDS and Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000). To survive summary judgment, Feaster must show: (1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions. *Id.* (citing *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 378 (7th Cir. 1998)). Once a *prima facie* case has been established, the burden shifts back to the employer to show that the disparity is justified by a merit system, a seniority system, a quantity/quality of production system, or a differential based on any factor other than sex. *Id.*

Feaster makes no attempt to cite any law with respect to an Equal Pay Act claim, explain what the elements of such a claim are, or demonstrate that she has provided evidence to support those elements. Not surprisingly, Feaster, therefore, fails to put forward the requisite evidence needed to survive summary judgment on this claim. *Fallon v. State of Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989) (plaintiff must show that her job and the male employee's job involved a "common core of tasks" or that "a significant portion of the two jobs is identical"). Feaster argues generally that she was entitled – not to the same salary as Russell and Robinson – but to a higher salary than her colleagues because she performed more work than they did. Not only does she totally fail to provide any specific evidence from which the court could compare her duties to theirs, but she neglects to provide the court with any legal authority that her claim to *higher* wages (as opposed to equal wages) is even contemplated by the Equal Pay Act. Feaster's Equal Pay Act claim is dismissed.

## CONCLUSION

Greyhound's motion for summary judgment is granted.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 10, 2005